IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-01750-MEH

VICTOR MORENO,

     Plaintiff,

v.

SPECIALIZED BICYCLE COMPONENTS, INC.,

     Defendant.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge.**

     Before the Court is Defendant's Motion for Summary Judgment (ECF 81) and Motion for Leave to File a First Amended Answer (ECF 93). The Motions are fully briefed, and the Court finds that oral argument would not materially assist in their adjudication. For the reasons that follow, the summary judgment motion is denied and the motion to amend is granted.

## BACKGROUND

### I.    Claims for Relief

     Plaintiff alleges that he was biking in Red Rocks Park while wearing Defendant's helmet. He crashed at a bend in the road and collided into a railing. He attributes his resulting head injuries to the helmet, which he contends did not perform as it should have. He seeks to hold Defendant liable for his injuries on the theory that the helmet's design was defective. He expresses that theory of wrongdoing through various product liability, tort, and breach of warranty causes of action.

Plaintiff does not assert a separate claim of defective manufacture[1] or inadequate warnings or instructions.

## II.        Scope of the Record

### A.        Defendant's Reliance on the Declaration of Dave Debus

Dave Debus has worked for Defendant as its Director of Product Creation, Helmets, since February 2020 (and thus after the helmet's manufacture and Plaintiff's injury). Mr. Debus' duties in that role "include managing helmet projects through design and into manufacturing, managing the design/development team in the United States and China, and responsibility for delivery of helmet products to the market." ECF 81-3 at ¶ 1. Defendant uses his declaration to describe the helmet's physical characteristics and its certification process. Mr. Debus relies on his employment experience and records review for his testimony.

Plaintiff objects to the declaration because Defendant did not disclose Mr. Debus as a witness. Defendant explains that it is using Mr. Debus as its new "Person Most Qualified" witness in the place of Clinton Mattacola who no longer is an employee. Plaintiff deposed Mr. Mattacola on January 16, 2020, and Plaintiff does not contend that Mr. Debus' testimony is inconsistent with Mr. Mattacola's. Even if Defendant should have disclosed Mr. Debus sooner, the Court sees no reason to preclude the use of his declaration for summary judgment purposes. Defendant explains how Mr. Debus is competent about the subject of his declaration in compliance with Fed. R. Civ. P. 56(c)(4), and Plaintiff raises no argument for why it otherwise would be inadmissible as evidence at trial to support a Fed. R. Civ. P. 56(c)(1) objection.

---

[1] Plaintiff cites Ms. Chatham's affidavit to make the alternative claim that if its design was not defective then its manufacture must have been because in the accident it did not perform according to the safety standards it was designed to meet. However, because the Court excludes Ms. Chatham's affidavit from consideration, it also excludes the manufacturing defect claim.

On the present arguments, the Court sees no basis to exclude Mr. Debus' declaration from consideration.

**B.    Plaintiff's Reliance on New Affidavits from His Expert Witnesses**

Plaintiff's two primary expert witnesses are Christopher Yakacki, Ph.D., and Lillian Chatham, MSME. A dispute concerning them relevant to the summary judgment ruling involves new affidavits that Plaintiff produced for the first time in his Response. At ECF 90-3 is Dr. Yakacki's affidavit, and at ECF 90-6 is Ms. Chatham's affidavit. Both were signed on May 27, 2021, the day before Plaintiff filed his Response. Defendant complains that both affidavits add to the record new opinions and claims not previously expressed. "Plaintiff's experts opine for the very first time that the Max helmet did not comply with all CPSC and Snell Memorial Foundation standards," and otherwise "bolster prior opinions and testimony that [Defendant] attacked in the motion." ECF 97 at 3.

Defendant complains that Dr. Yakacki tries to correct and bolster deposition testimony in which he admitted that he did not conduct a test to calculate the amount of force needed to displace Plaintiff's helmet either as currently designed or with the proposed alternative design. Defendant objects to Ms. Chatham's attempt to address her lack of testing or underlying scientific analyses or data to support her opinion that the helmet, had it stayed on Plaintiff's head, would have prevented the head injury. Defendant also challenges Ms. Chatham's opinion that the helmet suffers from a manufacturing defect not only because she asserts it for the first time in the disputed affidavit but because it lacks the support of reliable scientific methods or principles required by Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 593-94 (1993).

Defendant regards the new affidavits as impermissible supplementation. An expert witness shall produce a final, comprehensive written report that is "a complete statement of all opinions

the witness will express" and contains all supporting bases and reasoning. Fed. R. Civ. P. 26(2)(B)(i). Supplementation is permitted, Fed. R. Civ. P. 26(e)(1), and indeed is required if "the information initially provided is incomplete or incorrect," *Henderson v. Nat'l R.R. Passenger Corp.*, 412 F. App'x 74, 80 (10th Cir. 2011). Otherwise, supplementation is limited to "the narrow purpose [of] correcting inaccuracies or adding information that was not available at the time of the initial report." *S.E.C. v. Nacchio*, No. 05-cv-00480-MSK-CBS, 2008 WL 4587240, at *3, n.3 (D. Colo. Oct. 15, 2008).

Because Defendant raises the objection in its Reply, the Court does not have Plaintiff's position on the matter. Nevertheless, the record is clear that the expert witnesses wrote the affidavits after the conclusion of discovery, after Defendant had written its summary judgment motion, and indeed for the purpose of addressing the arguments Defendant raised therein. Nor does Plaintiff explain in his Response his reliance on them and how he may do so.

For present purposes, the Court does not decide whether the expert witnesses are using the new affidavits simply to explain and clarify previously stated opinions in some permissible way. Instead, the Court excludes from consideration the new affidavits to simplify the summary judgment analysis. The Court will look only to their reports and deposition testimony that predate the summary judgment motion.

### C.    Description of the Helmet's Parts

Dispositive to this lawsuit is whether the helmet came off Plaintiff's head before impact and the parts designed to prevent it from doing so. The parties disagree on how to refer to certain aspects of the helmet. Dr. Yakacki defines the helmet's "retention system" as "a complete assembly (i.e., a system of components) that secures the helmet in a stable position to the wearer's head." ECF 90-3 at 34. The most basic components are the straps that come down from the helmet

past the wearer's ears and the strap that connects them under the wearer's chin which is closed by a buckle. Defendant refers to the subject helmet's retention system in equivalent terms. ECF 81 at ¶ 5.

A helmet also may have an "occipital stabilizer" which is at the helmet's rear and sits behind the wearer's head. Dr. Yakacki defines it as "a component that adjusts circumferentially around the head and makes contact with the occipital bone." ECF 90-3 at 34. It may incorporate some device such as a headband or knob that adjusts the fit. The subject helmet had an occipital stabilizer component which Defendant describes as "a plastic circumferential ring which is adjusted by a dial at the rear of the head to help ensure proper fit," and indeed, Defendant refers to it as the helmet's "fit system." ECF 81 at ¶ 5. Plaintiff disagrees that the occipital stabilizer "fit system" is separate and apart from the helmet's "retention system." Rather, Plaintiff argues that the occipital stabilizer should be considered as an additional component of the retention system. ECF 90 at ¶ 5.

Because the parties dispute how to refer to the occipital stabilizer (whether as the helmet's fit system or retention system) and because that dispute is material to the lawsuit, the Court will discuss that particular component in a neutral way. For purposes of the below discussion, the Court will avoid using the term "fit system" as a way to refer to the occipital stabilizer unless otherwise appropriate for the discussion. Where the Court refers to the helmet's "retention system," it does so without implying whether the occipital stabilizer is or should be part of it.

## III.    Material Undisputed Facts

1.      On June 19, 2017, Plaintiff was riding his bicycle through Red Rocks Canyon in Jefferson County. ECF 81-5 at 9.

2.      Plaintiff had never been through this area before. He was traveling downhill and attempting to negotiate a hairpin turn in the road. He lost control and fell, or was thrown, from his bicycle. ECF 81-5 at 10-19.

3.      The parties dispute the details about how the accident happened with regard to his speed and path of travel as well as the exact location where Plaintiff came off his bicycle. ECF 90 at 3, ¶ 3; ECF 97 at 5, ¶ 3. However, the parties do not dispute that ultimately Plaintiff's head struck a wooden guardrail support post, causing injury. ECF 81-5 at 10-19.

4.      At the time of the accident, Plaintiff was wearing Defendant's "Max" model helmet, which he had bought sometime in 2016. ECF 1 at ¶¶ 14-16.

5.      The Max model helmet has a thermoplastic exterior shell and a liner made from polystyrene bead foam (sometimes called "EPS"). There is "a plastic circumferential ring that is adjusted by a dial at the rear of the head to help ensure proper fit" [which Defendant refers to as "the fit system" and is consistent with Dr. Yakacki's definition of an occipital stabilizer]. There are nylon webbing strips anchored to the helmet at four locations, and there is a nylon strap with a plastic buckle assembly that can be adjusted according to the wearer's head size [which Defendant says compromises the helmet's retention system]. ECF 81-13 at ¶ 2.

6.      Plaintiff's Claims for Relief are: (1) Negligence, (2) Strict Product Liability, (3) Manufacturer's Negligence, (4) Strict Product Liability for Misrepresentation of Fact, (5) Breach of Express Warranty, and (6) Breach of Implied Warranty of Merchantability. ECF 1.

7.      Plaintiff's claims are premised on the allegation that the Max model helmet is defective in design because it became displaced at some point during the accident sequence and did not shield his head from the direct strike against the guardrail post. ECF 81 at ¶ 7. His claims

also rely on the tests that Dr. Yakacki had performed on the subject helmet and exemplars. ECF 90 at ¶ 7.

8.       Plaintiff retained Christopher M. Yakacki, Ph.D., of KIC Consulting, to conduct a helmet performance analysis. ECF 81-6.

9.       Dr. Yakacki offered several opinions regarding the design of Defendant's Max helmet. ECF 81-7 at 20. Among them, Dr. Yakacki opined that:

       a.   "the retention system, particularly the occipital stabilizer, was not adequately secured to the helmet,"

       b.   Defendant "did not quantify the strength of the occipital stabilizer connection to the EPS foam," and

       c.   Defendant should have designed the helmet "such that the nylon straps were interwoven through the occipital stabilizer."

10.       According to Defendant, Dr. Yakacki does not expressly say that the Max helmet falls short of all applicable CPSC standards and B-90A certification standards.[2] ECF 81 at ¶ 10.

11.       Dr. Yakacki does not opine that the warnings that accompanied the helmet at the time of purchase were inadequate. ECF 81-9 at 18.

---

[2] Neither party points to where Dr. Yakacki directly addresses this particular point one way or the other. Because Dr. Yakacki did not expressly find non-compliance, Defendant infers that he regarded the helmet as compliant. Plaintiff responds that Dr. Yakacki's statement about insufficient testing implies non-compliance with safety standards. Testing the occipital stabilizer's performance as part of the helmet's retention system, would have shown a reduced ability to remain on a wearer's head. ECF 81-7 at 20. From Dr. Yakacki's opinion about the omitted test, Plaintiff reasons that a compliant helmet would have been more secure and thus would have performed under the same circumstances of his accident. Because the helmet failed to remain on his head, it must not have complied with safety standards.

12. Dr. Yakacki does not expressly say that the helmet Plaintiff was wearing at the time contained a manufacturing defect.[3] ECF 81 at ¶ 12.

13. Dr. Yakacki proposes an alternative helmet design in which the straps are routed through the occipital stabilizer fit system. Had the helmet been designed in that fashion, then "more likely than not it would not have come off [Plaintiff's] head" during the accident. Dr. Yakacki based that opinion on his surrogate testing. ECF 90-4 at 1.

14. Dr. Yakacki did not perform certain tests to measure the amount of force needed to remove the helmet from someone's head. He did not "put a helmet or an occipital stabilizer on somebody's head and tighten it to whatever degree . . . and determine how much force it took to take the occipital stabilizer off of somebody's head." ECF 81-9 at 6. He did not conduct a "scientific analysis" to determine the amount of force that caused the damage to the helmet. *Id.* at 10. He did not confirm whether the forces that caused the foam compression damage also was sufficient to compromise the integrity of the mouth port. *Id.* at 11-12. He does not know how much force the guardrail impact "translated into the helmet." *Id.* at 15. However, that does not mean Dr. Yakacki conducted no tests. For example, he conducted surrogate testing[4] whereby he observes how difficult it is for a surrogate person to remove the helmet. *Id.* at 13-14, 17.

15. Dr. Yakacki conducted no scientific analysis to calculate the amount of force that the alternatively designed helmet experienced during surrogate testing. ECF 81-9 at 13-14.

---

[3] To show a fact dispute over whether a manufacturing defect existed, Plaintiff relies on Ms. Chatham's affidavit. There, Ms. Chatham opines that if the helmet's design was proper, then the fact that it failed during the accident implies a manufacturing defect. However, Plaintiff's reliance on Ms. Chatham's affidavit does not create a fact dispute. First, the Court disregards it as being made too late, and second, Ms. Chatham does not expressly mention any manufacturing defect. Thirdly, even if Ms. Chatham had considered the potential of a manufacturing defect, it does not concern whether Dr. Yakacki did so.

[4] Defendant argues that Dr. Yakacki's "surrogate testing is unreliable because it is not based on reliable scientific methods or principles." ECF 97 at ¶ 14.

16.     Plaintiff retained Lillian Chatham, MSME, of Ponderosa Associates Limited to conduct a biomechanical analysis of his injuries.[5] ECF 81-6 at 3-4.

17.     To support her opinion that Plaintiff "likely would not have received a skull fracture" had his helmet remained on his head at the time of the guardrail impact, Ms. Chatham relied on the "literature" she cited in her report which consists of peer-reviewed literature about analyses of how helmets reduce head injury in bike accidents and the baseline standards derived from skull testing. ECF 81-10 at 7; ECF 90-5.

18.     Before Defendant put the Max helmet model in the public marketplace for purchase, it had sent samples to the Southern Impact Research Center ("SIRC") for certification. ECF 81-13 at ¶ 3.

19.     SIRC is an independent testing laboratory accredited by the American Association of Laboratory Accreditation ("A2LA"). A2LA is an internationally recognized accreditation body and also a member of the ASTM Committee for Helmets. *Id.*

20.     SIRC tested the Max helmet model pursuant to the requirements of the Consumer Product Safety Commission ("CPSC")'s Safety Standard for Bicycle Helmets, 16 C.F.R. §§ 1203, *et seq.* ("Helmet Standard"). The Max helmet became CPSC certified in 2009. ECF 81-13 at ¶ 3.

21.     CPSC requires batch testing of every production lot to ensure ongoing compliance. SIRC conducted the required batch testing on the Max helmet line consistently during its

---

[5]  Plaintiff adds that Ms. Chatham also is a helmet standards expert (ECF 90 at ¶ 16), and indeed, she opined about helmet standards in her report (ECF 90-8). Defendant objects that Plaintiff did not disclose her as a "helmet standards expert." However, in his "Initial F.R.C.P. 26(a)(2) Expert Disclosures" (ECF 81-6) on which Defendant relies, Plaintiff does not expressly state Ms. Chatham's subject matter areas of expertise. Defendant does not explain how conducting a biomechanical analysis means Ms. Chatham cannot be a helmet standards expert, nor did Defendant object to her helmet standards opinion when she rendered her initial report. Therefore, the Court denies Defendant's request at ECF 97 at ¶ 16 to exclude her helmet standards opinion.

production run. *Id*. Nevertheless, as Plaintiff adds citing 16 C.F.R. § 1203.33(b)(5), every single helmet must comply with governing standards. ECF 90 at ¶ 21.

22.     Unlike CPSC certification, the B-90A certification is voluntary, and it entails more stringent testing standards. The Snell Memorial Foundation tested the Max helmet for B-90A certification. ECF 81-13 at ¶ 4; ECF 1 at ¶ 13.

23.     The Max helmet passed the Snell Memorial Foundation's testing and earned B-90A certification in 2009. Thereafter, the Snell Memorial Foundation conducted batch testing. ECF 81-13 at ¶ 4.

24.     In 2015, Defendant added a webbing splitter to the Max helmet design for stability purposes. *Id*. at ¶ 3.

25.     In 2015, SIRC tested the Max helmet with the webbing splitter addition and certified it as CPSC compliant. *Id*.

26.     In 2015, the Snell Memorial Foundation tested the new Max helmet design and gave it B-90A certification. *Id*. at ¶ 4.

## **LEGAL STANDARDS**

### I.     **Fed. R. Civ. P. 56(c)**

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003). "Summary judgment is not a disfavored procedural shortcut. Instead, it is an important procedure designed to secure the just, speedy and inexpensive determination of every action." *Evans v. Cawthorn*, No. 16-3095-DDC-ADM, 2019 WL 5787952, at *3 (D. Kan. Sept. 6, 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)).

A court shall grant summary judgment if the pleadings, depositions, answers to

interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the lawsuit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party bears the initial responsibility of providing to the court the factual basis for its motion. *Celotex*, 477 U.S. at 327. "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002).

If the movant properly supports a motion for summary judgment, the non-moving party has the burden of showing there are issues of material fact to be determined. *Celotex*, 477 U.S. at 322. That is, the opposing party may not rest on the allegations contained in the complaint, but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 247-48 ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."). These specific facts may be shown "by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324). In other words, the opposing party must do more than make a conclusory denial of an asserted material fact but explain the reason for the denial with an accompanying specific reference to the evidentiary record. *Am. Auto. Ins. Co. v. Marlow*, 666 F. Supp. 2d 1209, 1212 (D. Colo. 2009); Section III(F) of the undersigned's Practice Standards---Civil Actions. If the parties tell two different stories, one of which is blatantly contradicted by the record so that no reasonable

jury could believe it, the court should not adopt that version. *Pierson v. Bassett*, 534 F. App'x 768, 771 (10th Cir. 2013).

"[T]he content of summary judgment evidence must be generally admissible and . . . if that evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, *i.e.*, the evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

## II.    Leave to Amend Answer

Defendant asks to amend its Answer principally for the purpose of adding the affirmative defense of preemption but also to make other adjustments consistent with the arguments its raises in its summary judgment motion. Because Defendant seeks to make that amendment after the deadline set forth in the Scheduling Order, the good cause standard of Fed. R. Civ. P. 16(b)(4) applies. *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1205 n.4 (10th Cir. 2006) ("This Circuit adopted a similar interpretation of Rule 16(b)'s 'good cause' requirement in the context of counterclaims asserted after the scheduling order deadline." (citing *SIL-FLO, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1518–19 (10th Cir. 1990))). *See also*, *Vazirabadi v. Denver Public Schs.*, 820 F. App'x 805, 809 (10th Cir. 2020) (applying the standards of Fed. R. Civ. P. 16(b)(4) and 15(a) to a request to amend a pleading).

### A.    Fed. R. Civ. P. 16(b)

Rule 16 dictates that "[a] schedule may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). "After a scheduling order deadline, a party seeking leave to amend must demonstrate (1) good cause for seeking modification under Fed. R. Civ. P. 16(b)(4)

and (2) satisfaction of the Rule 15(a) standard." *Birch v. Polaris Indus., Inc.*, 812 F.3d 1238, 1247 (10th Cir. 2015) (quoting *Gorsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Ass'n*, 771 F.3d 1230, 1240 (10th Cir. 2014)). Rule 16(b)'s "good cause" standard is much different than the more lenient standard contained in Rule 15(a). Rule 16(b) does not focus on the bad faith of the movant, or the prejudice to the opposing party. Rather, it focuses on the diligence of the party seeking leave to modify the scheduling order to permit the proposed amendment. Properly construed, "good cause" means that scheduling deadlines cannot be met despite a party's diligent efforts. *Colo. Visionary Acad. v. Medtronic, Inc.*, 194 F.R.D. 684, 687 (D. Colo. 2000) (quoting *Dilmar Oil Co., v. Federated Mut. Ins. Co.*, 986 F. Supp. 959, 980 (D.S.C. 1997)). "Rule 16's good cause requirement may be satisfied, for example, if a plaintiff learns new information through discovery or if the underlying law has changed." *Gorsuch*, 771 F.3d at 1240. However, "[a] litigant's failure to assert a claim as soon as he could have is properly a factor to be considered in deciding whether to grant leave to amend." *Perez v. Denver Fire Dep't*, 243 F. Supp. 3d 1186, 1200 (D. Colo. 2017) (emphasis added). "To demonstrate good cause pursuant to Rule 16, the moving party must . . . 'provide an adequate explanation for any delay.'" *Lehman Bros. Holdings Inc. v. Universal Am. Mortg. Co., LLC*, 300 F.R.D. 678, 681 (D. Colo. 2014) (quoting *Strope v. Collins*, 315 F. App'x 57, 61 (10th Cir. 2009)); *D.R. Horton, Inc.-Denver v. Travelers Indem. Co. of Am.*, 281 F.R.D. 627, 630 (D. Colo. 2012). Further, a court may consider the procedural posture of a case in a Rule 16(b) "good cause" analysis. *Nicastle v. Adams Cty. Sheriff's Office*, No. 10-cv-00816-REB-KMT, 2011 WL 1465586, at *3 (D. Colo. Mar. 14, 2011), *Rec. adopted by* 2011 WL 1464588 (D. Colo. Apr. 18, 2011).

**B.     Fed. R. Civ. P. 15(a)**

Rule 15 states that after the deadline for amending a pleading as a matter of course, "a party

may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). The grant or denial of an opportunity to amend is within the discretion of the Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules. *Maloney v. City of Pueblo*, 323 F.R.D. 358, 360 (D. Colo. 2018) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). "Refusing leave to amend is generally only justified upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment." *Id.* (quoting *Frank v. U.S. West, Inc*., 3 F.3d 1357, 1365 (10th Cir. 1993)).

Prejudice in this context arises when the amendment unfairly affects the opposing party "'in terms of preparing their defense to the amendment.'" *Minter*, 451 F.3d at 1208 (quoting *Patton v. Gayer*, 443 F.2d 79, 86 (10th Cir. 1971)). Prejudice occurs most often "when the amended claims arise out of a subject matter different from what was set forth in the complaint and raise significant new factual issues." *Id.* Moreover, "[i]f a party opposes a motion to amend or to supplement on the grounds of futility, the court applies the same standard to its determination of the motion that governs a motion to dismiss under Fed. R. Civ. P. 12(b)(6)." *Conkleton v. Zavaras*, No. 08–cv–02612–WYD–MEH, 2010 WL 6089079, at *3 (D. Colo. Oct. 6, 2010), *Rec. adopted by* 2011 WL 839282 (D. Colo. Mar. 7, 2011).

## II.    Preemption

Public health and safety are traditional areas of state regulation, and a court does not assume that a federal statute supersedes the states' historic police powers unless Congress made preemption its clear and manifest purpose. If Congress's statutory direction is ambiguous, a court

accepts the reading that disfavors preemption to avoid unnecessarily disturbing the federal-state balance. *Cook v. Rockwell Int'l Corp.*, 790 F.3d 1088, 1094 (10th Cir. 2015). Defendant reads the applicable federal statute as preempting Plaintiff's state common law claims for relief. To resolve this dispute, the Court begins with federal statute's text.

### A.    Statutory Framework

#### 1.    Federal Helmet Safety Standards

Congress passed the Consumer Product Safety Act ("CPSA") in part "to develop uniform safety standards for consumer products and to minimize conflicting State and local regulations." 15 U.S.C. § 2051(b)(3). To accomplish that goal, Congress created the Consumer Product Safety Commission ("CPSC"), 15 U.S.C. § 2053, and gave it the power to set consumer product safety standards in terms of performance requirements, 15 U.S.C. § 2056(a)(1). "Any requirement of such a standard shall be reasonably necessary to prevent or reduce an unreasonable risk of injury associated with such product." 15 U.S.C. § 2056(a). Specifically, Congress saw need "to protect against the risk of helmets coming off the heads of bicycle riders." 15 U.S.C. § 6004(c)(2).

Under that grant of authority, CPSC promulgated safety standards for bicycle helmets at 16 C.F.R. §§ 1203, *et seq.*, ("Helmet Standard"). The Helmet Standard's purpose "is to reduce the likelihood of serious injury and death to bicyclists resulting from impacts to the head, pursuant to 15 U.S.C. 6001-6006." 16 C.F.R. § 1203.2. Congress identified the American National Standards Institute, Snell Memorial Foundation, and American Society for Testing and Materials ("ASTM") as sources of safety standards. 15 U.S.C. § 6004(b). An "approved bicycle helmet" is one that meets the final version of the standard. 15 U.S.C. § 6006(2).

The Helmet Standard describes the ways in which a helmet should perform in terms of positional safety (regarding the helmet's ability to remain on the wearer's head), the ability of the

retention system to remain intact, and "impact attenuation." 16 C.F.R. § 1203.12. It also defines how to test whether a helmet meets those performance requirements. The positional stability, or roll-off resistance, test is found at 16 C.F.R. § 1203.15. Generally speaking, that procedure involves fastening a helmet to a headform with its retention system and straps and dropping a weight on it to simulate the forces that would cause it to come off a wearer's head.

Congress also requires compliance certification. 15 U.S.C. § 2063(a). CPSC sets forth the guidelines for how to certify Helmet Standard compliance, 16 C.F.R. §§ 1203.30, *et seq*., including what constitutes a reasonable testing program, 16 C.F.R. § 1203.33(b). A "reasonable testing program" consists of tests that "are identical or equivalent to, or more stringent than, the tests defined in the standard." One or more helmets are selected from a production lot, and certification may be given if "there is reasonable assurance that all of the bicycle helmets in that lot comply with the requirements of the standard." 16 C.F.R. 1203.32(e).

## 2.   Preemption of State Standards and Requirements

The CPSA addresses the issue of state standards "which are designed to deal with the same risk of injury associated with [the federal] consumer product [safety standard]." Congress expressly precludes a state from either establishing or continuing "any provision of a safety standard or regulation which prescribes any requirements as to the [performance or design] of such product." 15 U.S.C. § 2075(a). However, it does permit requirements that are identical to the federal standard. *Id*. A state may impose a safety standard that exceeds the federal one if the terms of 15 U.S.C. § 2075(c) are met such as the requirement that the state standard "not unduly burden interstate commerce."

The CPSA thereby preempts state statutes, administrative regulations, or other positive enactments that concern the same risks of injury that the governing federal standard addresses. It

possibly may preempt state common law tort actions that would have the effect of creating a standard, but whether Section 2075(a)'s reach extends that far is not dispositive to this ruling.

### 3.   Saving Clauses

Even if, as Defendant argues, Section 2075(a) preempts both positive regulatory enactments and common law tort claims, it must be construed in conjunction with CPSA's full statutory framework. CPSA contains several additional provisions that preserve a consumer's range of remedies. For example, CPSA expressly makes its remedies to "be in addition to and not in lieu of any other remedies provided by common law or under Federal or State law." 15 U.S.C. § 2072(c). Nor does a product's compliance with the federal standard shield its maker from liability. "Compliance with consumer product safety rules or other rules or orders under this chapter shall not relieve any person from liability at common law or under State statutory law to any other person." 15 U.S.C. § 2074(a). Indeed, a "saving clause reflects a congressional determination that occasional nonuniformity [in safety standards and regulation] is a small price to pay for a system in which juries not only create, but also enforce, safety standards, while simultaneously providing necessary compensation to victims." *Geier v. Am. Honda Motor Co*., 529 U.S. 861, 871 (2000).

### A.   Express Preemption

In order to preempt a state's traditional police protection powers, a clear expression of congressional intent is required. The Tenth Circuit found the preemption and savings provision framework of the Manufactured Housing Act not to expressly preempt state common law liability. *Choate v. Champion Home Builders Co*., 222 F.3d 788, 793-94 (10th Cir. 2000). It reached that conclusion relying in part on *Geier v. Am. Honda Motor Co*., 529 U.S. 861 (2000). In *Geier*, the United States Supreme Court read the preemption and saving clause provisions in the National

Traffic and Motor Vehicle Safety Act in the same way. *Id*. at 1918. The parties cite no Tenth Circuit opinion that considers the CPSA framework. However, other courts have construed it as not expressly precluding a plaintiff from bringing a product liability claim against a manufacturer under a common law cause of action. *Leipart v. Guardian Indus., Inc*., 234 F.3d 1063, 1069 (9th Cir. 2000) (concluding that "federal safety standards promulgated under the CPSA do not pre-empt state common-law requirements"); *Colon v. BIC USA, Inc*., 136 F. Supp. 2d 196, 205 (S.D.N.Y. 2000) (concluding "that the presence of the saving clause in the CPSA eliminates a broad reading of the preemption provision to include common law claims").

Citing *Geier* and *Choate*, Defendant "withdraws its argument that plaintiff's claims are barred by express preemption." ECF 97 at 4, n.1.

## B.     Implied Preemption

Even if there is a saving clause, preemption still may be found if a common law claim nonetheless conflicts a federal statute. There are two circumstances that give rise to an actual conflict that has a preemptive effect. The first one occurs when it would be impossible for the defendant to comply with both the federal requirements and the standard that the plaintiff's successful tort action would establish. The second situation is when the plaintiff's state law claim would hinder, frustrate, or otherwise stand as an obstacle to the purpose and goals of the federal statute. *Choate*, 222 F.3d at 795.

## ANALYSIS

## I.     Waiver of the Preemption Defense

Plaintiff contends that Defendant has waived the argument that he may not pursue his state common law tort claims because federal statute preempts them. Preemption is the kind of defense that may be waived or forfeited if a defendant does not plead it as an affirmative defense in the

answer. *Cook*, 790 F.3d at 1092; *Sherman v. Sunsong Am., Inc*., No. 04CV300, 2007 WL 9797664, at *3 (D.Neb. Feb. 8, 2007). *See also*, *Yishak v. Old Republic Ins. Co*., No. 19-cv-03029-REB-NYW, 2020 WL 6870608, at *2 (D. Colo. Oct. 6, 2020) (concluding that ERISA preemption is an affirmative defense which is waived if not asserted in the defendant's answer).

Defendant did not expressly raise preemption in its answer, but it contends that its Affirmative Defense No. 6 implicitly includes a preemption argument. There, Defendant pleads that it "exercised reasonable care and acted in accordance with all applicable federal, state and local statutory, regulatory and common law requirements and standards." ECF 11 at 10. Defendant argues that Affirmative Defense No. 6 sufficiently put Plaintiff on notice. *See also Colon*, 136 F. Supp. 2d at 200 (agreeing with the same argument). Defendant makes the same argument with respect to Affirmative Defense No. 5 in which it seeks entitlement "to the presumptions contained in C.R.S. § 13-21-403." Defendant says those presumptions include compliance with federal standards and regulations. ECF 98 at 3.

To the extent Affirmative Defense Nos. 5 and 6 did not give Plaintiff notice, the Court finds good cause for Defendant to amend its Answer to add a preemption defense. Defendant seeks to add as Affirmative Defense No. 12 that "Plaintiff's claims may be barred in whole or in part through express preemption by the Consumer Product Safety Act, at 15 U.S.C. § 2075(a), or alternatively, through the doctrine of implied conflict preemption." Even if Defendant should have pleaded preemption in its Answer as originally filed, the Court finds no prejudice to Plaintiff from raising for the first time in its summary judgment motion. *See in re Air Crash Disaster*, 721 F. Supp. 1185, 1186 (D. Colo. 1988) (finding that plaintiffs received sufficient notice of the preemption defense from defendant's summary judgment motion, permitting late amendment of defendant's answer, and preferring not to resolve legal questions by procedural default); *Sherman*,

2007 WL 9797664 at *4 (noting that a court may allow a defendant to plead the affirmative defense of preemption at the summary judgment stage if the delay would not prejudice the plaintiff). At least in this case, preemption is purely a legal question without the need for fact development. Moreover, Plaintiff, himself, concedes that he was able to adequately address preemption in his Response (ECF 96 at 6), even if he would have preferred earlier notice.

Substantively, the parties' dispute over late amendment is not dispositive. The Court does not find Plaintiff's claims to be preempted after considering the defense on its merits.

## II.    Implied Preemption

Implied preemption requires a finding that Plaintiff's claims for relief actually conflict with CPSC standards. Actual conflict exists if compliance with both the federal and state standards would be impossible or if the state standard would frustrate the purpose and goals of the federal standard.

The Court begins the inquiry by clarifying what Plaintiff's claims are. For this particular issue, the Court excludes from its consideration whether Plaintiff has sufficient evidence to prove any of his theories about helmet defects. Instead, the Court considers only the nature of his claims and if they would create an inconsistent safety standard should he prevail on them.

Plaintiff asserts various causes of action for negligence in his Complaint but without specifying how Defendant breached any duties of care. ECF 1. The Scheduling Order says only that the helmet should have prevented [Plaintiff] from receiving any traumatic head/brain injuries" and Defendant breached its promise to consumers that the helmet complied with federal safety standards. ECF 20 at 2-3. In his Response, Plaintiff frames them as (1) a failure to test the helmet properly, (2) the helmet's failure to perform as the federal standards anticipate, and (3) not

designing the helmet to provide greater protection. ECF 90 at 17. In its Reply, Defendant refers to them simply as "defect claims" or "design defect claims."

Plaintiff complains about the helmet's design, arguing that the nylon retention straps in the back of the helmet should have been routed through the fit system. That is how Defendant describes the alleged design defect in its Reply. ECF 97 at 19, 24. As Plaintiff describes it, Defendant should have "woven the helmet's rear chinstraps through the occipital stabilizer" in order to make the helmet more stable and secure. ECF 90 at 1. Plaintiff also complains about the strength of the occipital stabilizer's connection to the helmet. *Id*. at 13. Plaintiff contends that the design he proposes would have been safer (as well as cost-effective). *Id*. at 14.

To the extent Plaintiff also alleges that Defendant should have tested the helmet in some different way, there is actual conflict. Defendant cites Dr. Yakacki's opinion "that the 'fit system's strength' should have been tested in the roll-off test because it cannot be "decoupled" from the rest of the retention system." ECF 90 at 13. If the helmet passed the test with only the chinstrap, it is unclear how a test of a *greater* retention system (chinstrap plus occipital stabilizer) would have yielded a different result. Nevertheless, because CPSC sets forth specific testing requirements, Plaintiff may not argue that Defendant (or a testing facility) should have conducted some other kind of test beyond what the Helmet Standard already specifies. However, to the extent Plaintiff makes this point to support his argument that the occipital stabilizer should have been incorporated into retention system (whereby the strength of the greater structure would have been subject of the test) or to say that the suggested test would have revealed a design defect in how the occipital stabilizer was joined to the helmet, then it relates to his defective design claim which he may pursue.

Regarding the defective design claim, Defendant does not argue that it would be impossible for it to use Plaintiff's suggestion and still comply with the CPSC's requirements. It is not that the governing standard required Defendant to design the helmet as it did. Consequently, the Court does not find preemption on the basis of "impossibility."

The focus of Defendant's argument instead is on whether Plaintiff's proposed alternative design would hinder CPSC's goals. ECF 97 at 19-26. The Court sees no such conflict. To begin with, the mere fact that the helmet was certified does not automatically shield Defendant from liability. CPSA expressly says to the contrary. 15 U.S.C. § 2074(a).

Nor does CPSC define the only way a helmet may be designed. Defendant does not say that the Helmet Standard requires it to design a helmet with certain features inconsistent with Plaintiff's suggestion. For example, the Helmet Standard did not expressly give Defendant the *choice* whether to combine the fit and retention systems, equivalent to the design choice at issue in *Geier*, 529 U.S. at 881. Indeed, the Helmet Standard "did not 'require' [Defendant's helmet] to take any particular form for any particular reason." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 493 (1996). Nor does this case present the situation in which the regulator already had rejected the suggested design as impractical that *Lady v. Neal Glaser Marine, Inc.*, 228 F.3d 598, 615 (5th Cir. 2000) addressed.

In the CPSA context, there is case law that applies *Geier's* reasoning to describe it as setting the mandatory minimum "floor" for safety, leaving room for improvement in design that state common law actions could foster. *Leipart*, 234 F.3d at 1070; *Colon*, 136 F. Supp. 2d at 208. If Plaintiff's proposed alternative design in fact would make the helmet safer by making it less likely to come off during an accident, then it would accomplish what the federal standard intended to achieve. Increasing the degree of protection above the federal standard does not necessarily create

a conflict. *Colon*, 136 F. Supp. 2d at 207. Plaintiff's tort claim would incentivize helmet manufacturers to incorporate safer designs. *Moe v. MTD Prods., Inc.*, 73 F.3d 179, 183 (8th Cir. 1995).

Should Plaintiff prevail on his defective design theory, his common law claim in effect would set a higher standard of safety. While that new resulting standard may be different that what the Helmet Standard prescribes, it does not necessarily mean an inconsistent result. Defendant does not show the kind of conflict that would justify preempting Plaintiff's ability to seek redress under state law.

## III.    Causation

Causation is a necessary element for each of Plaintiff's claims for negligence, strict products liability, manufacturer's negligence, misrepresentation of fact, breach of express warranty, and breach of implied warranty of merchantability. Proving causation, in turn, requires evidence in the form of expert witness opinion testimony. *Truck Ins. Exch. v. MagneTek, Inc.*, 360 F.3d 1206, 1214 (10th Cir. 2004); *Nash v. Wal-Mart Stores, Inc.*, No. 15-cv-02330-RM-MEH, 2017 WL 5188339, at *9 (D. Colo. Feb. 15, 2017). Defendant argues that Plaintiff's expert witnesses provide insufficient evidence to prove that his injury resulted from a helmet defect. For purposes of this ruling, the Court assumes that his expert witnesses are qualified and their opinions are reliable, arguments which Defendant raises in their Rule 702 Motions at ECF 80 and 82.

Plaintiff relies on the testimony of Dr. Yakacki who suggests an alternative design for the helmet's retention system, one that would have incorporated the occipital stabilizer by connecting it to the chinstraps. Dr. Yakacki opines that the alternative design would have made it more difficult (i.e., less likely) for the helmet to come off during this accident. In other words, the design would have "improved [the helmet's retention] characteristics." ECF 81-9 at 16-17. However, he

does not go so far as to guarantee that it would have prevented the helmet from doing so. Nor does Defendant explain why such a definitive statement is needed to survive summary judgment review.

Defendant more strongly objects to the opinion's supporting basis. At his deposition, Dr. Yakacki stated that he did not determine the amount of force that Plaintiff's helmet experienced during the accident or that it would take to dislodge a helmet with the suggested design. *Id*. at 6, 10-11, 15. Instead, Dr. Yakacki conducted a surrogate test in which he observed whether a person could pull the redesigned helmet off his head. His opinion rests mostly on the surrogate testing, but Dr. Yakacki also took photographs during a simulated roll-off test. *Id*. at 13-14. Dr. Yakacki provides further explanation on these points, but because he presents it in a new affidavit produced for the first time in response to Defendant's summary judgment motion, the Court does not include it for consideration. Nor does the Court determine for present purposes whether Dr. Yakacki's surrogate testing meets the Fed. R. Evid. 702 and *Daubert* standards.

Instead, the Court finds that Dr. Yakacki's opinion, as expressed in his reports and at deposition and assuming for present purposes that they are admissible as expert witness opinion, create a dispute of fact over causation. If the alternatively designed helmet more likely would have remained on Plaintiff's head, then there is sufficient inference, even if at the minimum, that the helmet had a design defect that caused it to be less safe.

Next, Plaintiff submits Ms. Chatham, his biomechanics and helmet standards expert, to hypothesize about the degree of injury he would have incurred had his helmet remained on his head at the time of impact. Ms. Chatham conceded the possibility of a skull fracture despite wearing a helmet. In other words, wearing a helmet does not guarantee against any sort of skull fracture in all accident situations. However, she did say that Plaintiff "*likely* would not have

received a skull fracture had he been wearing his helmet with the impact to the guardrail post." ECF 81-10 at 6-7 (emphasis added).

As with Dr. Yakacki, the focus of Defendant's objection instead concerns the foundation of Ms. Chatham's opinion. When asked for the "scientific basis" supporting her opinion, Ms. Chatham referred to the "peer-review literature" that she cited in her report in which cycling accidents were analyzed "to see the reduction in head injuries while wearing a helmet." ECF 81-10 at 7. She also referenced cadaver skull testing used to set helmet standards. ECF 90-5 at 1-2. On that basis, Ms. Chatham concluded "with a reasonable degree of engineering certainty that had [Plaintiff] been wearing his helmet, he would not have suffered a skull fracture." *Id*. at 1. Defendant does not include it in his argument, but Ms. Chatham discusses in her report studies about helmet effectiveness "in reducing the severity of head injuries" and helmet stability. ECF 90-6 at 30-31. In other words, Ms. Chatham states a supporting basis beyond mere general reliance on "literature." Even if at the minimum, Ms. Chatham's report and deposition testimony suffices to create a dispute of fact over whether Plaintiff's head injuries would have been less severe had his helmet remained on his head at the time of impact.

Whether there is some other reason to strike either Dr. Yakacki or Ms. Chatham's expert opinions, the Court leaves for ruling on the motions in limine. For summary judgment purposes, accepting their reports and deposition testimony as is, they are sufficient evidence from which a jury might find causation.

## IV.    Strict Product Liability for Misrepresentation of Fact, Breach of Express Warranty, and Breach of the Implied Warranty of Merchantability

Defendant argues that the fact that the Max helmet line was CPSC certified and has a B-90A certification from the Snell Memorial Foundation defeats Plaintiff's ability to prevail on these causes of action. Plaintiff counters that argument in several respects.

First, Plaintiff contends that the Max helmet model's certification is based on improper testing that excluded the helmet's "fit system." Because the helmet's "retention system" was not tested in its "entirety," Plaintiff argues that the helmet line may not actually meet safety certification standards in the first place. The only evidence that Plaintiff cites to support that theory is Paragraph 15 of Ms. Chatham's new affidavit at ECF 90-6, but this Court excludes it from consideration. Plaintiff refers to no evidence that predates the summary judgment motion.

Even if the helmet model line does meet the safety standards, Plaintiff reasons that his particular helmet did not perform as those standards anticipate. Ms. Chatham opines that the helmet experienced forces during the accident that were *less* than what the testing standard subjects it to. Nevertheless, it still failed to protect his head. Defendant challenges the reliability and admissibility of that particular opinion under Fed. R. Evid. 702 and *Daubert* standards. This Court will address that argument in its separate ruling on Defendant's motions in limine. For present purposes, the Court accepts Ms. Chatham's opinions regarding Plaintiff's speed and impact at the time of the accident as is, and finds it sufficient to create, even if at the minimum, a dispute of fact.

Third, Plaintiff infers from the ways in which the helmet broke and did not remain on his head that his helmet did not actually comply with certification standards. Defendant argues that "[t]o the extent that these claims are premised upon plaintiff's design defect allegations, [they] are preempted by implied conflict preemption." ECF 97 at 34-35. Defendant's argument implies that in the absence of preemption, Plaintiff's design defect theory does support these claims.

The parties' arguments about whether these particular claims survive summary judgment review are limited. However, the implication of Defendant's Reply is that there is evidence—if accepted—that could support Plaintiff's argument that the particular helmet that he had bought fell

short of express or implied representations about it. Defendant does not show how summary judgment should be entered in its favor on them.

## CONCLUSION

Plaintiff's core theory is that Defendant could have designed the helmet in a way that would have increased its ability to remain on his head during the accident event. Whether Plaintiff can prove negligence has yet to be determined, but the Court does not find his tort causes of action to be preempted. Plaintiff also relies heavily on new affidavits in which his expert witnesses either express wholly new opinions or supplement existing ones. Even without taking the new affidavits into consideration, the Court finds the record to provide sufficient minimum evidence to support his claims. Should the rulings on the parties' motions in limine change the evidentiary posture of Plaintiff's claims for relief, the Court will consider leave to file a new summary judgment motion.

For the above reasons, the Court **denies** Defendant's Motion for Summary Judgment [filed May 28, 2021; ECF 90].

The Court **grants** Defendant's Motion for Leave to File a First Amended Answer to Plaintiff's Complaint [filed June 3, 2021; ECF 93]. Defendant shall file its proposed First Amended Answer (ECF 93-1) separately into the record.

Entered this 17th day of August, 2021, at Denver, Colorado.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge

27